STATE OF NORTH CAROLINA, EX REL. UTILITIES COMMISSION, AND VIRGINIA ELECTRIC AND POWER COMPANY v. WOODSTOCK ELECTRIC MEMBERSHIP CORPORATION AND NORTH CAROLINA ELECTRIC MEMBERSHIP CORPORATION

No. 47

(Filed 6 January 1970)

**1. Electricity § 2— competition of suppliers — rural territory — prior law**

Prior to the enactment of G.S. 62-110.2 in 1965, electric membership cooperatives and investor-owned public utility companies were free to compete in the rural portions of the State in the absence of contractual restrictions upon such right, irrespective of the fact that such competition resulted in substantial duplication of power lines and facilities.

**2. Electricity § 2; Utilities Commission § 7— assignment of rural territory — electric suppliers — present law**

G.S. 62-110.2(b) confers upon each electric supplier in the State the right, in territories outside of municipalities, to serve all "premises" being served by it on 20 April 1965, and the right to serve "premises" initially requiring service after that date, which premises are located within 300 feet of a line of such supplier and not in a territory assigned by the Utilities Commission to a different supplier pursuant to G.S. 62-110.2(c).

**3. Electricity § 2— supply of electricity — premises in rural areas — choice of supplier**

Any "premises" in territories lying outside of a municipality and more than 300 feet from the line of any electric supplier can be served, prior to an assignment of such territory by the Utilities Commission, by any electric supplier chosen by the user, and service of such premises by any other supplier is prohibited. G.S. 62-110.2(b)(5), (10).

**4. Electricity § 2; Utilities Commission § 7— assignment of rural territory — division of service area between co-op and power company — validity of assignment**

On application by an electric membership cooperative for an assignment of territorial rights pursuant to G.S. 62-110.2, order of the Utilities Commission directing that the cooperative alone serve all users in a rural service area whose demand for power does not exceed 400 KW and that any user therein whose demand exceeds 400 KW be served either by the cooperative or by an electric power company, with the user to choose the supplier, *held* not to violate the rights of the cooperative under N. C. Constitution, Art. I, §§ 7, 17, or under U. S. Constitution, Fourteenth Amendment, where (1) the assignment did not take from the cooperative any right previously enjoyed by it, (2) the assignment did not impose upon the cooperative the duty to serve any user it did not request permission to serve, and (3) there is no suggestion that service to any potential user would be unprofitable or burdensome.

**5. Constitutional Law § 4— standing to deny constitutionality of statute**

One may not, in the same proceeding, seek an advantage which is authorized by a specific statute only and at the same time deny the constitutionality of the statute.

**6. Electricity § 2; Utilities Commission § 7— assignment of rural service area — two suppliers in same area — authority of Commission**

Under the statute authorizing the Utilities Commission to assign rural service areas to electric suppliers by "adequately defined boundaries," G.S. 62-110.2(c), the Commission has authority, when the public convenience and necessity so require, (1) to assign the same territory to one supplier for service below a specified level of demand and to another supplier above that level of demand, and (2) to permit a membership cooperative who has been assigned the area of smaller demand to serve a user whose demand is above the division line if the user desires the services of the cooperative.

**7. Electricity § 2; Utilities Commission § 7— assignment of rural service area — purpose of statute**

The overriding purpose of G.S. 62-110.2(c)(1), which authorizes the Utilities Commission to assign rural service territory to electric suppliers, is to promote the public interest, not the business of the electric membership cooperative or that of the investor-owned utility.

**8. Electricity § 2; Utilities Commission § 7— assignment of rural service area — consideration of economic development**

The attraction to a sparsely settled rural territory of industry which will develop its natural resources and provide opportunity of employment

to its residents is one of the "other things," within the purview of G.S. 62-110.2(c)(1), to be considered by the Commission in determining the assignment of rural territory to electric suppliers.

**9. Electricity § 2;  Utilities Commission § 7— assignment of rural service area — consideration of factors**

In assigning rural service areas to electric suppliers pursuant to G.S. 62-110.2, the Utilities Commission may consider, in addition to development of natural resources and employment opportunities, (1) the past history of service to residential, agricultural, and small commercial users in adjacent territories, (2) the capital required for supplying electric power to large users in the territory and the past experience of a supplier in serving such users, and (3) the demonstrated preference of a substantial class of potential users for one supplier over another.

**10. Utilities Commission § 9— findings of fact — review**

Where the evidence before the Utilities Commission is not brought forward in the record on appeal, all of the Commission's findings of fact are deemed supported by competent and sufficient evidence, and the findings are binding upon the Supreme Court.

**11. Electricity § 2— assignment of rural service area — division of boundary at 400 KW — sufficiency of order**

Order of the Utilities Commission determining that a demand level of 400 KW is to be the "boundary" between the areas to be served by an electric membership cooperative and by power company in a given geographic area, the cooperative to be solely responsible for demand below 400 KW, *held* not arbitrary and capricious, where (1) the cooperative is assigned users whose demands for electric service are similar to those previously served by it, (2) contemplated phosphate mining operations in the area, and related industrial activity, will result in power requirements exceeding 400 KW, and (3) the cooperative has never served a demand larger than 400 KW but the power company has demonstrated its ability to do so.

MOORE, J., took no part in the consideration or decision of this case.

APPEAL by Woodstock Electric Membership Corporation and North Carolina Electric Membership Corporation from the decision of the Court of Appeals, reported in 5 N.C. App. 663.

Woodstock Electric Membership Corporation, hereinafter called Woodstock, and Virginia Electric and Power Company, hereinafter called VEPCO, are suppliers of electric power to users thereof in Beaufort, Hyde and Washington Counties. Subsequent to the enactment in 1965 of G.S. 62-110.2, Woodstock applied to the Utilities Commission for the assignment to it of extensive areas in those counties lying outside the corporate limits of any municipality and more than 300 feet from any then existing line of any supplier. Shortly thereafter, VEPCO filed a like application. As to some of

the areas the two applications overlapped, so that both applicants sought the right to supply electric power in the same area.

The Utilities Commission consolidated the applications for hearing. At such hearing voluminous evidence, both oral and documentary, was introduced by both applicants. The Commission made extensive findings of fact and reached certain conclusions upon which it entered an order assigning to each applicant alone areas applied for by it only and certain of the areas for which both had applied. These portions of the order are not presently in controversy.

As to certain other areas, designated B-1 to B-6, inclusive, the Commission ordered that Woodstock alone serve all users therein whose demand for power does not exceed 400 kilowatts and that any user therein whose demand exceeds that limit be served either by Woodstock or by VEPCO, depending upon which supplier the user chose to serve it. The effect is that in these areas Woodstock alone may serve residential, agricultural, commercial and small industrial users — the categories of users served by Woodstock in the past — while large industrial users — of which none presently exist and none have ever existed in any of these areas — would be served by Woodstock or by VEPCO as each user may prefer.

The six areas in question are exclusively rural and completely undeveloped for industrial purposes at the present time. Explorations in recent years have disclosed in the B-6 area extensive phosphate deposits, which offer basis for widespread expectation that substantial mining operations may soon be begun in that area and may be followed by the establishment therein of mining facilities and other related industrial enterprises, each of which will consume large quantities of electric power.

Woodstock and North Carolina Electric Membership Corporation, an intervenor before the Utilities Commission, appealed from the order of the Commission to the Court of Appeals. That court held the Utilities Commission had made an assignment of areas B-1 to B-6, inclusive, of a type permitted by the statute, G.S. 62-110.2(c)-(1), but had not made findings of fact sufficient to support its establishment of the 400 KW demand as the dividing line between the exclusive right of Woodstock to serve and the right of the user to choose its supplier. On that ground, the Court of Appeals reversed the order of the Utilities Commission and remanded the matter to the Commission "for such further proceedings as may be appropriate."

Woodstock and the intervenor appealed to this Court on the ground that the type of assignment made by the Commission in the

six areas, which the Court of Appeals held not unlawful per se, would violate rights of Woodstock guaranteed by Art. I, §§ 7 and 17, of the Constitution of North Carolina, and by the Fourteenth Amendment to the Constitution of the United States. Simultaneously, the appellants filed their petition for writ of certiorari to review the decision of the Court of Appeals on the ground that it failed to hold the order of the Utilities Commission to be in excess of the statutory authority of the Commission and arbitrary in that the order undertakes to permit both suppliers to serve within the same area. That is, Woodstock makes no point of the selection by the Utilities Commission of a demand level of 400 KW as the division line in Areas B-1 to B-6, but contends that, both as a matter of its constitutional right and by virtue of the statute under which the Utilities Commission has acted, no order can be valid which permits both suppliers to operate in these areas, whatever demand level be taken as the division point between Woodstock's exclusive right to serve and the right of the user to select its supplier. For this reason, Woodstock contends that the order of the Court of Appeals remanding the proceeding for further action by the Utilities Commission in fixing this division point is erroneous.

Both VEPCO and the Utilities Commission contend that the Court of Appeals correctly ruled that no constitutional right of Woodstock has been violated by the order of the Commission, or would be violated by a similar order issued after further proceedings pursuant to the remand directed by the Court of Appeals. VEPCO further contends that, while review by this Court is premature until the Commission has acted under the remand, the Court of Appeals erred in holding that the findings of fact made by the Commission are not sufficient to support its choice of the demand level of 400 KW as the division line. The Utilities Commission raises no objection to the remand of the proceeding to it but does not concede that its findings of fact are insufficient to support its order.

Woodstock brought forward in the record on appeal, both in the Court of Appeals and in this Court, only a portion of the evidence introduced before the Utilities Commission, its contention being that the findings of fact made by the Commission do not support its order, not that any finding of fact is unsupported by competent evidence.

The order of the Utilities Commission is not set forth in the record filed with this Court, but all portions thereof, deemed pertinent to this appeal by the parties, are quoted in the opinion of the Court of Appeals. Of these, the portions set forth below are deter-

minative of the questions presented upon this review of the decision of the Court of Appeals.

The Utilities Commission made the following findings of fact:

"1. Both VEPCO and Woodstock are electric suppliers as defined by Section 62-110.2(a)(3) of the North Carolina General Statutes; * * *.

"2. * * * VEPCO generates the preponderance of the electric power it sells.

"3. * * * Woodstock does not generate electric power, but purchases the preponderance of its total requirements as a wholesale customer of VEPCO.

"4. Both VEPCO and Woodstock are capable of supplying, and do supply, good, adequate, and dependable electric service for the requirements of their existing customers and members, respectively, in the areas of the three counties mentioned. * * *

"7. The entire area of the applications, being situate outside the corporate limits of municipalities, and more than 300 feet from the lines of another supplier as defined by the Act, must be described as rural and agricultural. * * *

"8. The historical development of electrical facilities in the area as a whole may be described as follows: For many years, VEPCO has served Woodstock as well as the municipal systems of the Cities of Washington and Belhaven at wholesale. * * * VEPCO's distribution facilities are concentrated almost exclusively in the northern third of the total area. For the purpose of moving bulk power, VEPCO has a 34.5 KV line in the southern portion of the total area * * * VEPCO has one (1) retail distribution customer on this line at approximately 400 KW demand. * * * Woodstock's distribution facilities * * * may be said to cover the southern two-thirds of the area * * *.

"11. In one large area in Beaufort County * * * (marked B-6 on VEPCO Exhibit No. 2 and hereafter referred to as the 'B-6' area) there are no lines of any supplier as defined in the Act other than Woodstock * * *.

"Woodstock seeks to have this area assigned to it; VEPCO seeks to have the area left unassigned or, in the alternative, assigned to VEPCO.

"12. In the areas * * * marked B-1 and B-3 on VEPCO Exhibit No. 2 (and hereafter referred to by reference to the

VEPCO Exhibit) there are virtually no facilities of any supplier as defined in the Act other than Woodstock, except for VEPCO's 34.5 KV line through Area B-3 and the VEPCO retail customer in Area B-1, as previously found. * * *

"14. The area marked B-2 * * * has the aforesaid 34.5 KV line running east-west through the south-central portion. The area marked B-5 * * * has the aforesaid 34.5 KV line running along the northern border thereof. There are no other lines of a supplier as defined by the Act in either area. * * *

"15. The areas designated B-1, B-2, B-3, B-4 and B-5 * * * are areas of potential industrial development * * *.

"16. The area designated B-6 * * * is an area of great industrial potential in that it has been established that the area contains one of the richest phosphate deposits in the United States, is under active consideration for phosphate mining operations * * *. These mining operations and processes usually require complex and technical electric power accommodations, very large blocks of available power, alternate sources of power supply, and experienced supplier personnel readily available and technically trained. Further, such mining operations tend to attract allied industrials, such as chemicals and fertilizer, having large power requirements, and requiring large capital investments to install service.

"17. Industrial and manufacturing concerns tend to locate on and demand the services of VEPCO as opposed to Woodstock. There are many reasons for this. Some industries are philosophically opposed to, and wary of, becoming members in cooperatives where they have no more protection than a single vote in rate and policy matters, i.e., they prefer the regulation of the State Commission to the regulation of the Cooperatives' membership and the REA. Others base their preference on the electric utility's financial strength and its ability to supply operational expertise, specialized equipment, alternate and emergency supplies of energy and many others.

"Industries usually have more than one available site for location and, all other things being equal, tend to choose that site served or to be served by VEPCO and tend not to choose the site to be served by Woodstock. While the phosphate deposit in the B-6 area will require the mining industry to locate there without regard to which supplier is assigned the area, the testimony of mining officials is to the effect that assignment to Woodstock would tend to cause their companies not to perform

all their mining processes on site and that they probably would only mine the basic product and ship it elsewhere for operations and processes requiring heavy electric loads. The testimony further indicates that manufacturers and producers other than mining will tend not to locate near the mines if the area is assigned exclusively to Woodstock. * * *

"19. The areas where Woodstock's facilities are located are predominantly residential and farming, or rural, areas. * * * Woodstock serves two (2) industrial customers with demands greater than 50 KW. Its largest service demand is to Coastal Lumber Company, with a demand exceeding 240 KW and possibly as high as 400 KW demand.

"20. The portions of the total area in which VEPCO's facilities are located are also predominantly residential and farming, or rural, areas. However, VEPCO has a number of very large power users in this and other states. It has a permanent staff of experts in promoting industrial development and attending to complex power supply and load requirements. * * *

"23. VEPCO is financed by capital furnished from the sale of securities in the financial markets and from internally generated funds. Its bonds are rated AA, and it has a proven ability to raise large sums of capital on comparatively short notice. * * * While Woodstock has never been called upon to provide service for which it could not obtain capital, it nevertheless has not been called upon to raise capital to meet the electric needs of extremely large industrial customers.

"24. Woodstock is organized and exists for the purpose of furnishing electricity to persons in rural areas not otherwise having central station service. It is not organized to, and does not operate on, the basis of 'pecuniary profit,' as does VEPCO. For this reason, the procurement of large volume industrial loads is not as fully compatible with the corporate and public objectives of Woodstock as it is with VEPCO."

After making the foregoing findings of fact, the Utilities Commission made the following statements which the Commission does not specifically designate "Findings of Fact":

"From the testimony and from experience in other matters involving electric cooperatives and power companies, it appears to us almost universally true that cooperative members prefer a continuation and expansion of cooperative service and territory. ·

"On the other hand, industry, particularly heavy industry, just as strongly prefers the service of the power company.
*  *  *

"*  *  * Traditionally, the cooperative has not attracted industry to its service area while the power company has. The attraction of the capital wealth of industry also builds up residential loads. We are convinced that many areas of the State will be handicapped in, if not precluded from, obtaining industry, unless weight is given to industry's obvious preferences for the power company.

"Further, we hold that the power company is better equipped and better able to serve heavy industrial loads. We are of the considered opinion that it would be harmful both to the cooperative and to the public in an area with industrial potential to assign that area to the cooperative for all purposes. On the other hand, where in many cases the cooperative has historically served the residential, agricultural, and small commercial loads, we think it would be manifestly unjust and duplicative to take this area and their potential residential, agricultural, and commercial loads from the cooperative."

Upon the basis of these "findings of fact" and statements, the Commission assigned areas B-1 to B-6, inclusive, as follows:

"To Woodstock for purposes of loads up to and including 400 KW demand; all loads with contract demands greater than 400 KW being hereby assigned jointly to VEPCO and Woodstock; provided that this joint assignment is made subject to the consumers' reasonable choice of supplier  *  *  *."

*Crisp, Twiggs & Wells for Woodstock Electric Membership Corporation and North Carolina Electric Membership Corporation.*

*Edward B. Hipp and Larry G. Ford, Commission Attorneys, for North Carolina Utilities Commission.*

*Joyner, Moore & Howison for Virginia Electric and Power Company.*

LAKE, J.

[1]    G.S. 62-110.2 was enacted in 1965. Prior to its enactment, electric membership cooperatives, such as Woodstock, and investor-owned public utility companies, such as VEPCO, were free to compete in the rural portions of this State, in the absence of contractual restrictions upon such right, irrespective of the fact that such com-

petition resulted in substantial duplication of power lines and facilities. *Utilities Commission v. Lumbee River Electric Membership Corp.*, 275 N.C. 250, 166 S.E. 2d 663; *Blue Ridge Electric Membership Corp. v. Power Co.*, 258 N.C. 278, 128 S.E. 2d 405; *Pitt & Greene Electric Membership Corp. v. Light Co.*, 255 N.C. 258, 120 S.E. 2d 749; *Carolina Power & Light Co. v. Electric Membership Corp.*, 211 N.C. 717, 192 S.E. 105. It is not contended that there is any contract of either supplier involved in this proceeding which restricts its right to compete for the business of potential users of its service within the six territories in question. Thus, prior to the Act of 1965, G.S. 62-110.2, neither Woodstock nor VEPCO had a monopoly upon the right to sell electric power to the potential users of such power in the six territories here in question, or to any class of those users.

[2, 3]   The Act of 1965 did not, without more, alter this situation. By its terms, G.S. 62-110.2(b), there was conferred upon each electric supplier in the State, i.e., upon both Woodstock and VEPCO, the right, in territories outside of municipalities, to serve all "premises" being served by it on 20 April 1965, and the right to serve "premises" initially requiring service after that date, located within 300 feet of a line of such supplier and not in a territory assigned by the Utilities Commission to a different supplier, pursuant to G.S. 62-110.2(c). However, all parts of all six of the territories here in controversy lie more than 300 feet from the line of any electric supplier. Under the provisions of the Act, G.S. 62-110.2(b), Clauses (5) and (10), any "premises" within the territories here in question could, prior to such an assignment of such territory by the Utilities Commission, have been served by any supplier chosen by the user, and service of such "premises" by any other supplier was prohibited. *Utilities Comm. v. Lumbee River Electric Membership Corp., supra.*

[4]   Thus, prior to the enactment of G.S. 62-110.2, Woodstock never had any exclusive right to serve any user upon any "premises" within any territory here in controversy. After the effective date of G.S. 62-110.2, and prior to the assignment by the Utilities Commission out of which this appeal arises, Woodstock had no right whatever to serve any such user unless chosen by such user. It obviously follows that the assignment, of which Woodstock here complains, took from Woodstock no right previously enjoyed by it.

Woodstock applied to the Utilities Commission for the assignment to it of the exclusive right to serve every user, i.e., every prospective user, within all of the six territories here in controversy. Thus, the assignment, of which Woodstock complains, does not im-

pose upon it the duty to serve any user Woodstock did not request permission to serve.

It does not appear upon the record before us that any user of any type within any territory here in controversy has demanded service from Woodstock. Thus, we do not have before us, and we do not determine, whether Woodstock, not having been granted its application in its entirety, may be compelled to serve any user which the order of the Commission authorizes Woodstock to serve. Woodstock has not suggested in the record, or in its brief or oral argument before us, that any service right granted it by the order is not presently desired by it, or that to serve any user which the order permits it to serve would be unprofitable or burdensome to Woodstock. Thus, Woodstock has shown no duty imposed upon it by the order amounting to an unconstitutional deprivation of its property or liberty.

The order denies to Woodstock no right to serve any user of electric power, large or small, within any territory here in controversy, which user desires service by Woodstock. Woodstock's sole complaint is that, under the terms of the order, it will not have the right to serve certain, presently hypothetical users who, if and when they come into existence, will not want its services. The right of a potential user of electric power to choose between vendors of such power seeking his patronage is not lightly to be denied. *Blue Ridge Electric Membership Corp. v. Power Co., supra.* Prior to the assignment of which it complains, no statute of this State, no order of any administrative agency of this State and no decision of this Court, conferred upon Woodstock the right to compel such user to choose between using power sold by Woodstock and having no electric service at all. This being true, the assignment in question deprived Woodstock of no property and of no liberty. Since, by the terms of the order of which Woodstock complains, any user in any of the six territories, whose demand for electric power exceeds 400 KW, may choose Woodstock as its supplier, the order confers no monopoly upon VEPCO.

[5] Woodstock does not challenge the constitutional validity of G.S. 62-110.2. On the contrary, this proceeding was initiated by Woodstock's application to the Utilities Commission for an assignment to it of territorial rights pursuant to this statute. One may not, in the same proceeding, seek an advantage which is authorized by a specific statute only and, at the same time, deny the constitutionality of the statute. *Ramsey v. Veterans Commission,* 261 N.C. 645, 135 S.E. 2d 659; *Convent v. Winston-Salem,* 243 N.C. 316, 90 S.E. 2d 879. Woodstock does not here attempt to do so.

**[4]**    There is, therefore, no merit in the contention of the appellants that the order of. the Utilities Commission violates their rights under Art. I, § 7 or § 17, of the Constitution of North Carolina, or under the Fourteenth Amendment to the Constitution of the United States.

**[6]**    We turn to the contention that the order of the Utilities Commission exceeds its authority under G.S. 62-110.2. Woodstock contends that subsection (c) of this .statute requires that the six territories in question be assigned to one supplier exclusively. Its contention is not that some demand level other than 400 KW should have been used as the dividing line between the exclusive right of Woodstock to serve and the right of the user to select its supplier. Woodstock contends that, under the statute, no user may be permitted to choose between two or more suppliers in the territories in question. To so construe the statute not only deprives VEPCO of a right previously enjoyed by it, but also deprives the potential user of the right he formerly had to choose between willing suppliers. The statute should not be so construed unless this is clearly its intent: *Blue Ridge Electric Membership Corp. v. Power Co., supra.*

The statute provides:

"(c) (1)    In order to avoid *unnecessary* duplication of electric facilities, the Commission is authorized and directed to assign, * * * to electric suppliers all areas, by adequately defined boundaries, that are outside the corporate limits of municipalities and that are more than 300 feet from the lines of all electric suppliers as such lines exist on the dates of the assignments; provided, that the Commission may leave unassigned any area in which the Commission, in its discretion, determines that the existing lines of two or more electric suppliers are in such close proximity that no substantial avoidance of duplication of facilities would be accomplished by assignment of such area. The Commission shall make assignment of areas in accordance with *public convenience and necessity,* considering, *among other things,* the location of existing lines and facilities of electric suppliers and the adequacy and dependability of the service of electric suppliers, but not considering rate differentials among electric suppliers. * * *" (Emphasis added.)

The Utilities Commission has no authority to assign any service right in these six territories, either to Woodstock or to VEPCO, except insofar as that authority has been conferred upon it by this statute. Obviously, it may not make an assignment which is contrary to the provisions of the statute. *Utilities Commission v. Lum-*

bee *River Electric Membership Corp., supra; Utilities Commission
v. Motor Lines,* 240 N.C. 166, 81 S.E. 2d 404. In the *Lumbee River*
case, we said of the statute here in question:

> "The former absence of statutory provisions restricting com-
> petition between electric membership corporations and public
> utility suppliers of electric power gave rise to many contracts
> between these two types of suppliers designed to fix their re-
> spective territorial rights, which contracts, in turn, gave rise to
> much litigation. * * * In the hope of putting an end to or
> reducing this turmoil, the 1965 Legislature enacted G.S. 62-110.2,
> the language of which was the result of collaboration and agree-
> ment between the two types of suppliers."

Woodstock contends that since the proviso in subsection (c)(1)
permits the Commission to leave a territory unassigned under speci-
fied circumstances, it may not leave a territory unassigned where,
as here, those circumstances do not exist. We need not now determine
that question, for we agree with the Court of Appeals that the Com-
mission did not leave the six territories here in question unassigned.
Each territory, in its entirety, is assigned to Woodstock alone for
service of all users whose demands do not exceed 400 KW. Each
territory is assigned in its entirety to both Woodstock and VEPCO
for the service of users whose demands exceed 400 KW, each such
user to have the choice of Woodstock's service or of VEPCO's ser-
vice. This raises two questions: (1) Can the same territory be treated
by the Commission as two service "areas," one including users of a
specified type and the other including users of other types? (2) If
so, can one of these "areas" be assigned to more than one supplier?

Subsection (c) declares the purpose for which the authority to
assign "areas" is conferred upon the Commission. That purpose is
"to avoid *unnecessary* duplication of electric facilities." (Emphasis
added.) To accomplish this objective, the statute directs the Com-
mission to make assignments "in accordance with public convenience
and necessity." In determining whether an assignment is in accord
with "public convenience and necessity," the Commission is directed
to consider the "adequacy and dependability of the service of elec-
tric suppliers." It is also directed to consider "other things."

[7-9]    The overriding purpose of this statute is to promote the
public interest, not the business of the electric membership coopera-
tive or that of the investor-owned utility. The attraction to a spar-
sely settled rural territory of industry, which will develop its natural
resources and provide opportunity of employment to its residents, is
one of the "other things" to be considered by the Commission in

determining what assignment of the territory will be in accord with public convenience and necessity. None of the things which the statute directs the Commission "to consider" is determinative, per se, of the requisite accord between the assignment and public convenience and necessity. The past history of service to residential, agricultural, and small commercial users in adjacent territories is another factor to be considered in this determination. The capital required for supplying electric power to large users in such a territory and the past experience, or lack of experience, of a supplier in serving such users is also a factor which may properly be considered. The demonstrated preference of a substantial class of potential users of electric power for the service of one supplier rather than that of another supplier is also a matter properly to be considered, both for the reason that such users are part of the "public" whose convenience and necessity is to be promoted and for the further reason that, if such potential users are not satisfied with the available service in the territory, they may elect to establish their own plants elsewhere and thus deprive the entire "public" of the desired industrial development of the territory.

[6]   Obviously, subsection (c) of G.S. 62-110.2 contemplates the assignment of a territory to a single supplier for all classes of users of electric power, nothing else appearing. However, in our opinion, the statutory direction that the Commission assign service areas "by adequately defined boundaries" does not compel the conclusion that the intent of the Legislature was to require the Commission to choose between (1) jeopardizing the industrial development of a geographic area by assigning it exclusively to an electric membership cooperative, or (2) boxing the cooperative into the narrow strips bordering its existing lines by assigning the territory outside those strips to an investor-owned utility for all types of electric service. In such a situation, we think the statute leaves the Utilities Commission free to promote the public convenience and necessity by treating the geographic area as two separate service areas, the "adequately defined boundary" between which is the level of the user's demand for electric service. Thus, we hold that it is within the statutory authority of the Commission, when the public convenience and necessity so requires, to assign a territory to one supplier for service below a specified level of demand and to another supplier for service above that level of demand.

We also construe subsection (c) of G.S. 62-110.2 to authorize the Commission, having determined, upon sufficient and competent evidence, that the public convenience and necessity would best be pro-

moted by dividing the geographic area into two service areas on the basis of the users' demand levels, to permit, on the basis of public convenience and necessity, an electric membership cooperative, to which the area of the smaller demands has been assigned, to serve a user whose demand is above the division line, if that user desires to become a member of the cooperative and thus to use its service. We do not have before us any question as to the authority of the Commission to require an unwilling cooperative to build the facilities necessary to serve such a user and we express no opinion thereon.

[10] The evidence before the Utilities Commission not having been brought forward into the record on appeal, all of the findings of fact made by the Commission are deemed supported by competent and sufficient evidence. *In Re Housing Authority*, 233 N.C. 649, 65 S.E. 2d 761. These findings are, therefore, binding upon this Court. *Utilities Commission v. Champion Papers, Inc.*, 259 N.C. 449, 130 S.E. 2d 890. The conclusion of the Commission that the public convenience and necessity requires the division of each of these six geographic areas into two service areas based upon the level of the users' demands cannot be deemed arbitrary and capricious in view of these findings of fact.

[11] There remains for consideration the question of whether the facts found by the Commission are sufficient to support the determination that the "boundary" between the two service areas within each of the six geographic areas be the demand level of 400 KW. We conclude that the findings are sufficient to support that determination by the Commission.

The drawing of this division line at the demand level of 400 KW throws into the service area assigned to Woodstock all users whose demands for service are similar to those heretofore served by Woodstock. The findings by the Commission establish the adequacy and dependability of Woodstock's service at those demand levels. Considering the context, it is implicit in the findings that the anticipated mining operations and related industrial activities will require "large blocks of available power," will have "large power requirements" and "heavy electric loads," and that the demand of many of these establishments will exceed 400 KW. Thus, the findings by the Commission are sufficient to support, though not to require, its conclusion that contemplated mining operations and related industrial operations in the geographic area, upon which the contemplated industrial development of the territory depends, will necessitate the use of equipment and installation resulting in a demand above that level. The Commission found Woodstock has never served a demand larger than 400 KW but VEPCO had demonstrated its ability to do

so. Under these circumstances, the Commission's expert choice of the level of 400 KW as the "boundary" between the two service areas cannot be deemed arbitrary or capricious. Consequently, it was error for the Court of Appeals to reverse the order of the Commission.

The judgment of the Court of Appeals is, therefore, reversed and the matter is remanded to that court for the entry of a judgment affirming the order of the Utilities Commission.

Reversed and remanded to the Court of Appeals.

MOORE, J., took no part in the consideration or decision of this case.