**CITY OF NEW BERN v. CARTERET-CRAVEN ELEC. MEMBERSHIP CORP.**

[356 N.C. 123 (2002)]

CITY OF NEW BERN, A MUNICIPAL CORPORATION v. CARTERET-CRAVEN ELECTRIC
MEMBERSHIP CORPORATION

No. 450PA01

(Filed 16 August 2002)

**Utilities— competing electric companies—two buildings—
premises—separate metering**

The trial court erred by concluding that a new veterinary
hospital building constructed by an electric customer remained
part of an existing adjoining premises for purposes of N.C.G.S.
§§ 160A-331 and 160A-332 requiring continued electric service
from plaintiff original supplier, because the new building became
a new premises initially requiring electric services under the
terms of the Electric Territorial Act of 1965 and thus was eligible
to receive electric service from a new supplier that the customer
chose such as defendant based on the facts that: (1) the new hos-
pital building throughout all relevant periods was and today
remains separately metered, and the charges for its electrical
service were calculated independently of charges for service to
the old hospital building; (2) the question or fact of duplication of
lines is irrelevant since from the outset both parties had lines well
within three hundred feet of both buildings, with defendant's
lines being closest to the new building, and the customer is
located within a municipality without a primary supplier; (3) the
use of the same address for both premises was merely a request
granted by the post office, and the fact that both buildings used
the same level of electric service is not material; (4) there is no
evidence that the veterinarians constructed an entirely new clinic
for the purpose of facilitating a change in electric service, and
there is no evidence that defendant took part in any improper
action to induce the hospital to switch providers; and (5) written
consent under N.C.G.S. § 160A-332(a)(3) is only required for a
change in service to the same premises, and there are only two
secondary suppliers involved.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unani-
mous decision of the Court of Appeals, 145 N.C. App. 140, 548 S.E.2d
845 (2001), affirming an order for summary judgment entered by
Ragan, J., on 8 March 2000 in Superior Court, Craven County. Heard
in the Supreme Court 12 February 2002.

*Poyner & Spruill LLP, by Nancy B. Essex and Gregory S.Camp; and J. Phil Carlton, for plaintiff-appellee.*

*Taylor & Taylor, by Nelson W. Taylor, III, for defendant-appellant.*

*Poyner & Spruill LLP, by Richard J. Rose, on behalf of ElectriCities of North Carolina, Inc., amicus curiae.*

*North Carolina Electric Membership Corporation, by Susan Barry, Associate General Counsel, and Robert B. Schwentker, General Counsel, amicus curiae.*

*Adams Kleemeier Hagan Hannah & Fouts, by R. Harper Heckman and Gregory T. Higgins, on behalf of Duke Energy Corporation, amicus curiae.*

LAKE, Chief Justice.

The question presented for review in this case is whether a new building constructed by an electric customer remained part of an existing, adjoining "premises" requiring continued electric service from its original supplier, or whether such building became a "premises initially requiring electric service" under the terms of the Electric Territorial Assignment Act of 1965 (the "Electric Act"), and thus was eligible to receive electric service from a new supplier, Carteret-Craven Electric Membership Corporation. *See* N.C.G.S. § 160A-332(a)(3) (2001). The Court of Appeals affirmed the trial court, holding that the new building was part of the existing "premises" and that the existing service provider, the City of New Bern, therefore retained its exclusive right to provide electric service to the electric customer. *City of New Bern v. Carteret-Craven Elec. Membership Corp.*, 145 N.C. App. 140, 145-46, 548 S.E.2d 845, 848-49 (2001). For the reasons set forth below, we conclude otherwise and reverse the decision of the Court of Appeals.

This dispute revolves around the question of which electric service provider maintains the right to provide electric service to the Havelock Animal Hospital in Havelock, North Carolina. Havelock is a municipal corporation located in Craven County, North Carolina, which does not own or operate its own municipal electric system. Plaintiff City of New Bern is a municipal corporation in Craven County that owns and operates a municipal electric distribution system. *See* N.C.G.S. § 160A-312 (2001). Defendant Carteret-Craven Electric Membership Corporation ("CCEMC") is an electric member-

ship cooperative organized pursuant to chapter 117, article 2 of the North Carolina General Statutes, titled "Electric Membership Corporations," and authorized under N.C.G.S. § 117-18 to contract for the sale of electricity. Both plaintiff and defendant serve customers in Havelock, which is located approximately sixteen miles from New Bern.

In the late 1950s, plaintiff began providing electric service to a veterinary clinic located in Havelock at 415 Miller Boulevard and owned at that time by Dr. Rodman Lancaster, D.V.M. Sometime during the 1970s, Dr. William P. McClees, Jr., D.V.M., operated a veterinary clinic at this location and first leased and later bought the building in 1978. Thereafter, Dr. McClees formed a corporation, the Havelock Animal Hospital, with Dr. Larry S. Paul, Jr., D.V.M., to operate the veterinary practice, and a partnership, the Havelock Animal Clinic, to own the real estate used by the hospital.

In 1986, the partnership bought from Vance and Ruth Harrington property located adjacent to the existing hospital. In October 1995, the two veterinarians began construction of a new hospital building located entirely on the land purchased from the Harringtons. Workers completed construction of this building in the autumn of 1996. In order to avoid the expenses of printing new stationery and of changing their advertisements, the clinic received permission from the post office to use the old address, 415 Miller Boulevard, for the new building even though it is actually located at a different, adjoining location, at 413 Miller Boulevard.

Plaintiff City of New Bern provided electric service to the old building. After construction began on the new building, Dr. Paul contacted defendant CCEMC and asked that it provide service to the new building. In March 1996, the hospital filed a membership application with CCEMC, and CCEMC began supplying electric service to the new building. At this time, only some x-ray equipment was located in the new building. During the construction of the new building, the veterinarians continued to work out of their old building. In August 1996, the doctors moved all operations except the kennel into the new building. The doctors moved the kennel in September 1996. Plaintiff discontinued electric service to the old building on 24 September 1996, at the request of the doctors. In February 1997, the doctors demolished the older building. From March until September 1996, the two buildings were separately billed and metered, and the charges for electric power were calculated independently for each of the buildings.

CITY OF NEW BERN v. CARTERET-CRAVEN ELEC. MEMBERSHIP CORP.

[356 N.C. 123 (2002)]

At the time construction of the new clinic began in October 1995, both plaintiff and defendant had existing electric lines located so that the new building was entirely within three hundred feet of each party's lines. The municipality of Havelock has never issued a franchise to any electric company or supplier. Both parties agree that each is a "secondary supplier" for Havelock, as such term is defined under the Electric Act. "Secondary supplier" is there defined as "a person, firm, or corporation that furnishes electricity at retail to one or more consumers other than itself within the limits of a city but is not a primary supplier." N.C.G.S. § 160A-331(5) (2001).

On 20 January 1999, New Bern brought this action against CCEMC, alleging that defendant had violated plaintiff's exclusive statutory right to provide electric service to the hospital. Plaintiff requested a permanent injunction and sought damages. On 18 February 1999, defendant filed its answer to the complaint denying that plaintiff had an exclusive right to serve the hospital. On 21 December 1999, plaintiff filed a motion for summary judgment. On 8 March 2000, the trial court entered an order granting partial summary judgment for plaintiff. In its order, the trial court enjoined defendant from providing electric service to the clinic and ordered it to disconnect its service. The trial court also held that plaintiff should begin service to the clinic within fourteen days from entry of the order. The trial court ordered that plaintiff recover damages from defendant in an amount to be determined at a subsequent trial on the issue.

Defendant filed its notice of appeal on 16 March 2000. On 9 May 2000, the trial court entered an order suspending execution and enforcement of the order granting partial summary judgment until a final decision of this matter on appeal, and defendant posted a bond in the amount of $3,000 for the payment of such costs and damages as might be incurred or suffered by plaintiff if it should be found to be wrongfully injured by that order. The Court of Appeals affirmed the trial court's decision, and this Court subsequently granted defendant's petition for discretionary review.

Thus, the fact-specific question before this Court is whether plaintiff New Bern possesses the exclusive statutory right to provide electric service to the veterinary hospital now operating in its new building. Plaintiff contends that the Court of Appeals correctly determined that both the old and the new hospital buildings constitute the same "premises" for purposes of N.C.G.S. §§ 160A-331 and 160A-332, and therefore plaintiff has the exclusive right to provide electric service to the clinic. Defendant counters that the new hospital building is

part of a separate "premises," and thus, it may provide electric service to the clinic pursuant to the doctors' request. We agree with defendant and hold that under the specific facts of this case, the customer hospital, pursuant to the Electric Act, was free to choose CCEMC to provide its electric service.

Chapter 160A, article 16, part 2 of the Electric Act, entitled "Electric Service in Urban Areas," and codified at N.C.G.S. §§ 160A-331 through 160A-338, governs the provision of electric service within a municipality such as Havelock. The Electric Act was intended to resolve the disputes of electric suppliers with limited litigation. *See State ex rel. Util. Comm'n v. Lumbee River Elec. Membership Corp.*, 275 N.C. 250, 258, 166 S.E.2d 663, 669 (1969). The language of the Electric Act was carefully chosen to provide certainty with respect to service rights and to promote orderly competition among electric suppliers. *See Domestic Elec. Serv., Inc. v. City of Rocky Mount*, 285 N.C. 135, 141, 203 S.E.2d 838, 842 (1974). The Electric Act, however, does not address specifically all situations—such as the one before the Court today—that may arise between suppliers. Nevertheless, given the intent of the Electric Act, a close examination of the applicable statutes provides guidance for our decision in this unique situation. Section 160A-332(a) provides, in pertinent part:

(a) The suppliers of electric service inside the corporate limits of any city in which a secondary supplier *was* furnishing electric service on the determination date . . . shall have rights and be subject to restrictions as follows:

(1) The secondary supplier shall have the right to serve all premises being served by it, or to which any of its facilities are attached, on the determination date.

. . . .

(3) Any premises initially requiring electric service after the determination date which are located wholly within 300 feet of a secondary supplier's lines and wholly within 300 feet of another secondary supplier's lines, but wholly more than 300 feet from the primary supplier's lines, as the lines of all suppliers existed on the determination date, *may be served by the secondary supplier which the consumer chooses,* and no other supplier shall thereafter furnish electric

> service to such premises, except with the written consent of the supplier then serving the premises.

N.C.G.S. § 160A-332(a)(1)(3) (emphasis added).

In the instant case, Havelock is not serviced by a "primary supplier," as defined by section 160A-331(4), because the municipality neither "owns and maintains its own electric system" nor contracts with another entity to do the same. N.C.G.S. § 160A-331(4). The parties agree, however, that they are both "secondary suppliers" for Havelock, as defined by N.C.G.S. § 160A-331(5). They also agree that the applicable "determination date" is 20 April 1965. *See* N.C.G.S. §§ 160A-331(1b), 160A-332(a)(3). As of that date, both plaintiff and defendant maintained power lines within the boundaries of Havelock, and the veterinary clinic was "wholly within 300 feet" of the lines of both electric companies. *See* N.C.G.S. § 160A-332(a)(3).

The only disagreement by the parties, and thus the dispositive question on appeal, is whether the new hospital building is a "premises initially requiring electric service." N.C.G.S. § 160A-332(a)(3). The Electric Act of 1965 defines "premises" as

> the building, structure, or facility to which electricity is being or is to be furnished. Two or more buildings, structures, or facilities that are located on one tract or contiguous tracts of land and are used by one electric consumer for commercial, industrial, institutional, or governmental purposes, shall together constitute one "premises," *except that any such building*, structure, or facility shall not, together with any other building, structure, or facility, constitute one "premises" *if the electric service to it is separately metered and the charges for such service are calculated independently of charges for service to any other building*, structure, or facility.

N.C.G.S. § 160A-331(3) (emphasis added).

"When the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction." *State ex rel. Util. Comm'n v. Edmisten*, 291 N.C. 451, 465, 232 S.E.2d 184, 192 (1977); *see also Hlasnick v. Federated Mut. Ins. Co.*, 353 N.C. 240, 244, 539 S.E.2d 274, 277 (2000). Thus, a close examination of the language of section 160A-331(3) is required to determine the rights of the parties in the instant case.

Plaintiff correctly observes that the new hospital building is located on a tract of land contiguous to the land on which the old hospital stood and that it is used by the same electric consumer for the identical commercial purpose. While the definition of the term "premises" states that "[t]wo or more buildings . . . that are located on one tract or contiguous tracts of land and are used by one electric consumer for commercial . . . purposes, shall together constitute one 'premises,' " N.C.G.S. § 160A-331(3), these facts are not dispositive of the issue.

The definition of "premises" also contains a very specific exception: "any such building . . . shall not, together with any other building, . . . constitute one 'premises' *if the electric service to it is separately metered and the charges for such service are calculated independently of charges for service to any other building." Id.* (emphasis added).

The new hospital building throughout all relevant periods was and today remains "separately metered," and the charges for its electrical service were "calculated independently of charges for service" to the old hospital building. *Id.* In March 1996, the hospital filed a membership application with CCEMC, and defendant began electric service to the new building. The veterinarians moved all hospital operations into the new building by September 1996. In February 1997, the doctors demolished the older building. Thus, from March until September 1996, the two buildings were separately metered and billed, and the charges for electric power were calculated independently for each. The hospital falls squarely within the exception to the general definition provided in section 160A-331(3), and thus the old and new hospital buildings do not constitute one "premises" for purposes of the Electric Act.

Having determined that the new hospital building is a separate "premises" under section 160A-331(3), we next examine N.C.G.S. § 160A-332(a)(3) to determine the rights of the customer to choose its electric service provider. Both plaintiff and defendant are "secondary suppliers" for the municipality of Havelock, N.C.G.S. § 160A-331(5), and competition between them for the animal hospital's business is governed by section 160A-332(a)(3).

As of the determination date, both plaintiff and defendant had existing electric lines located "wholly within 300 feet" of the original building. These lines were also in place at the time construction of the new premises began in October 1995. Section 160A-332(a)(3) speaks

in terms of the premises, not the customer, "initially requiring electric service." As the new hospital building constituted a new premises under section 160A-331(3), it "initially requir[ed] electric service" in March 1996, even if the same customer had previously used electricity for an identical commercial enterprise in the old building on the adjoining tract. The veterinarians were therefore free to choose from among competing secondary suppliers, pursuant to section 160A-332(a).

We note that generally the State strictly regulates where electric service providers may do business and which consumers they may serve. Customer choice is very limited in this context. *See, e.g.,* N.C.G.S. § 160A-332. Nevertheless, where the State has chosen to allow consumer choice, such as under section 160A-332(a)(3), " 'the right of a potential user of electric power to choose between vendors of such power seeking his patronage is not lightly to be denied.' " *Domestic Elec.*, 285 N.C. at 143, 203 S.E.2d at 843 (quoting *State ex rel. Util. Comm'n v. Woodstock Elec. Membership Corp.*, 276 N.C. 108, 118, 171 S.E.2d 406, 413 (1970)); *see also Blue Ridge Elec. Membership Corp. v. Duke Power Co.*, 258 N.C. 278, 281, 128 S.E.2d 405, 407 (1962). Here, the veterinarians believed that defendant would provide better electric service for their animal hospital, and under these particular circumstances, they were free to choose this service provider.

Plaintiff's arguments for a contrary conclusion are not persuasive. The fact that New Bern already maintained service to the same address does not change our analysis. As Justice Lake, Sr. stated for this Court soon after the General Assembly passed the Electric Act, "[i]f the Legislature has enacted a statute declaring the right of a supplier of electricity to serve, notwithstanding the availability of the service of another supplier closer to the customer, neither this Court nor the Utilities Commission may forbid service by such supplier merely because it will necessitate an uneconomic or unsightly duplication of transmission or distribution lines." *Lumbee River*, 275 N.C. at 257, 166 S.E.2d at 668. Further, under the circumstances of this case, the question or fact of duplication of lines is irrelevant because from the outset both parties had lines well within three hundred feet of both buildings, with defendant's lines being closest to the new building.

Additionally, the use of the same address, 415 Miller Boulevard, for both premises was merely a request granted by the post office and does not change our conclusion. Customers already knew of the old

address and location of the hospital, and continued use of the original street number merely allowed the veterinarians to maintain their same stationery and advertisements. This small matter of convenience should not be viewed as supportive of the clinic's two buildings being one "premises" within the meaning of the statute. Nor is the fact that both buildings used the same level of electric service material to our analysis.

There also is no evidence that the veterinarians constructed an entirely new clinic for the purpose of facilitating a change in electric service. The doctors stated that a new building was necessary because of the increased demands of their practice and the inadequacy of the old building. In fact, the construction of a new building or facility, a large and expensive project, weighs heavily in favor of defendant's position. Such a project would not be undertaken merely to gain a choice in electric service. There is no evidence that defendant took part in any improper action to induce the hospital to switch providers. In fact, Dr. Paul contacted CCEMC regarding service. Furthermore, the separate metering of Havelock Animal Hospital's two buildings cannot be considered an attempt to circumvent the Electric Act. In light of the fact that the new premises initially required service in March 1996, and that the charges for this service could be calculated separately, the customer was within its rights in this case to obtain separate metering. Important to this conclusion is the fact that all services performed in the old building were moved to the new hospital, and the old building was demolished. The new building thus required separate metering because of the old building's planned destruction after the completion of the hospital's move.

Finally, plaintiff asserts that under subsections 160A-332(a)(3) through (6), a secondary supplier has no right, without prior written consent from the existing supplier, to commence service to a customer who is already receiving service from another supplier who has the right to provide service under the Electric Act. Here, plaintiff did not give its written consent. Written consent, however, is required only for a change in service to the same premises. N.C.G.S. § 160A-332(a)(3). In the instant case, there are only two secondary suppliers involved, and section 160A-332(a)(3) clearly governs our analysis.

While it may be true that the statutes under the Electric Act of 1965 do not expressly address the exact situation before the Court today, we believe that our interpretation of the applicable provisions best preserves the overall intent of the General Assembly, as

expressed in the Electric Act, and protects the interests of electric providers as well as customers. Given the very fact-specific nature of the dispute before us, this situation will not arise often or otherwise threaten the delicate balance struck by the General Assembly when it enacted the Electric Act of 1965. Put simply, the time and expense of constructing a new building and demolishing an old one would rarely, if ever, be undertaken merely to effect a change of the electric service provider.

We therefore conclude that the Havelock Animal Hospital was entitled to choose defendant CCEMC as its electric service provider. The customer is located within a municipality without a primary supplier, and the two secondary suppliers involved have maintained distribution lines wholly within three hundred feet of the customer as of the applicable determination date. When such a customer constructs a new building that is separately metered and charges separately calculated, and then demolishes the old building, the new building must be considered a new premises under the Electric Act of 1965, and such customer is free to choose the secondary supplier that it believes will provide the best electric service to the new premises. For the foregoing reasons, the decision of the Court of Appeals is reversed, and this case is remanded to that court for further remand to the trial court for disposition in accord with this opinion.

REVERSED AND REMANDED.