STATE OF NORTH CAROLINA ᴇx ʀᴇʟ. UTILITIES COMMISSION
AND DUKE POWER COMPANY, APPLICANT v. RUFUS L. ED-
MISTEN, ATTORNEY GENERAL

No. 145

(Filed 31 January 1977)

1. **Utilities Commission § 6— fixing rates — exercise of legislative func-
   tion**
       The Utilities Commission is a creation of the Legislature and, in
   fixing rates to be charged by public utilities, exercises the legislative
   function.

2. **Utilities Commission § 6— fixing rates — authority of Commission**
       The Utilities Commission has no authority except that given to it
   by statute; *a fortiori*, the Commission has no authority to permit
   that which is forbidden by statute or to extend a previously granted
   rate increase which the statute has declared terminated.

3. **Statutes § 5— unambiguous statute — construction**
       When the language of a statute is clear and unambiguous, it
   must be given effect and its clear meaning may not be evaded by an
   administrative body or a court under the guise of construction.

4. **Electricity § 3; Utilities Commission § 6— statutory termination of
   fuel clause — extension of clause by Utilities Commission**
       The statute authorizing the Utilities Commission to fix reason-
   able and just rates for public utility service, G.S. 62-3(24), did not
   permit the Commission to extend its previously authorized rate in-
   creases "based solely upon the increased cost of fuel" beyond 1 Sep-
   tember 1975, the date provided by G.S. 62-134(e) for the full termina-
   tion of such fuel adjustment charges.

5. **Electricity § 3; Utilities Commission § 6— statutory termination of
   fuel clause — validity**
       The termination of the fuel clause rate increases by G.S. 62-134(e)
   was not unjust or a "penalty" since the statute authorized the Utilities
   Commission, after hearing, to incorporate into the basic rates of a
   utility, chargeable on and after 1 September 1975, an increase deter-
   mined by the then cost of coal.

6. **Electricity § 3; Utilities Commission § 6— statutory termination of fuel
   clause — surcharge to recover past coal expenses**
       The purpose of the Fuel Adjustment Clause was not the "recov-
   ery" of past excess expenditures for fuel but was to provide a
   measure of the reasonably anticipated cost of coal used in generating
   the kwh to which the factor was to be applied; therefore, when the
   Fuel Adjustment Clause was terminated by G.S. 62-134(e) on 1 Sep-
   tember 1975, there was no accumulation of money due the power
   companies under the Fuel Adjustment Clause in addition to that col-
   lectible through the companies' regular bills for services in prior

months, and an order thereafter entered by the Utilities Commission permitting a power company to impose a surcharge for the recovery of the excess cost of fossil fuel burned during the two months immediately preceding the termination of the Fuel Adjustment Clause was in excess of the Commission's authority and without justification either in law or in the name of fair play.

Justice COPELAND dissenting.

Chief Justice SHARP and Justice MOORE join in the dissent.

APPEAL by the Attorney General from the decision of the Court of Appeals, reported in 30 N.C. App. 459, 227 S.E. 2d 593, which affirmed an order of the North Carolina Utilities Commission, hereinafter called the Commission, Judge Martin dissenting.

The order from which the present appeal is taken was issued 27 August 1975. The portions of it pertinent to this appeal are:

"1. That effective on bills rendered on and after September 1, 1975, Duke Power Company is hereby authorized to adjust its basic retail electric rates by the addition thereto of 0.4181¢/KWH based solely on increased fuel costs pursuant to North Carolina G.S. 62-134(e).

                    *     *     *

"4. That effective on bills rendered on and after September 1, 1975, Duke Power Company is hereby authorized to apply a temporary surcharge designed to recover the unbilled revenues accrued as of August 31, 1975 at [sic] a result of the lag in the old fuel adjustment clause on its North Carolina retail jurisdictional service. The surcharge should be designed on a ¢/KWH basis to recover the total deferral plus associated gross receipts taxes over a period of approximately twelve (12) months. The surcharge shall begin on September 1, 1975 and be terminated when the actual unbilled revenue total attributable to North Carolina retail jurisdictional service is recovered."

The appeal of the Attorney General relates only to the surcharge purportedly authorized by paragraph 4 of the Commission's order, above quoted.

The following history of the Fuel Adjustment Clause, derived from the record before this Court in Case No. 131, Fall

Term 1976, in which the validity of that clause was in question, will be helpful to an understanding of the present appeal.

On 21 June 1973, the Commission issued its order in a general rate case, substantially increasing Duke's basic retail rates and setting them at levels which the Commission then found would enable Duke to earn a fair share on the fair value of its properties used and useful in rendering electric service to the public. The rate schedules then so fixed contained no fuel adjustment clause.

Within a few weeks thereafter, Duke applied to the Commission for a further increase in its basic retail rates designed to produce annually $60,000,000 in additional revenues. This application was set for hearing and the proposed new rates were suspended pending such hearing. This application was based upon statistical data reflecting Duke's revenues and operating costs in a 12 months' test period ending 31 July 1973.

On 30 October 1973, the Commission issued its order allowing Duke to put into effect, pending such hearing, an interim increase in its basic retail rates designed to produce annually $28,000,000 in revenues over and above those designed to be produced by the rates which had been fixed in the order of 21 June 1973. This interim increase was made "effective on bills rendered on metered service on and after November 15, 1973, for service rendered after October 15, 1973." The stated basis for this order was that the rate increase which had been granted on 21 June 1973 was not sufficient to enable Duke to attract capital for its contemplated expansion of its plant.

On 30 November 1973, while its above mentioned application for the $60,000,000 rate increase was awaiting hearing, Duke filed with the Commission, simultaneously, two more separate applications or requests for rate adjustments. The first of these was a motion, in the then pending proceeding for "Additional Interim Rate Relief," this being a request for authority to put into effect immediately, without waiting for a hearing, further increases in rates totaling $10,519,000 per year, which increase Duke asserted was necessary to offset the sharp increase in the cost of coal which had occurred since the end of the test year used in the then pending general rate case (31 July 1973). The second application, so filed by Duke on 30 November 1973, was an application for authority to adjust all of its retail rate schedules by adding thereto an automatic coal

cost adjustment clause "to become effective on bills rendered on and after January 1, 1974, with respect to coal burned on and after November 1, 1973."

In response to these two applications, so filed on 30 November 1973, without notice or hearing, the Commission issued on 19 December 1973 two separate orders. The first such order, after stating that the cost of coal burned by Duke in October 1973, had substantially increased since 31 July 1973 (the end of the test period in the then pending general rate case), authorized Duke, pending a final hearing by the Commission, to put into effect "on bills rendered on and after January 19, 1974 for service rendered on and after December 19, 1973," a further interim increase in its basic rates designed to produce additional revenues of $7,900,000 per year, the Commission having found that Duke, in its application for "Additional Interim Rate Relief," had miscalculated the effect upon it of increases in fuel costs since 31 July 1973.

The second of the orders issued simultaneously on 19 December 1973 provided:

> "1. That effective on bills rendered on and after January 19, 1974 for service rendered on and after December 19, 1973 with respect to coal burned on and after November 1, 1973, the Applicant, Duke Power Company, is authorized and permitted to put into effect the coal cost adjustment clause attached to its application as Exhibit B."

The effect of the Coal Cost Adjustment Clause was to add to the customer's bill for service for each month, beginning with bills rendered on and after 19 January 1974 (for services on and after 19 December 1973), over and above the bill computed on the basic rate as so increased by the interim orders above mentioned, an additional charge measured by the excess of the cost per kilowatt hour of coal burned in Duke's generating stations, during the second month preceding the current billing month, over and above the base cost of coal per kilowatt hour generated in Duke's generating stations during such second preceding month, this being computed pursuant to the following formula:

$$"a = \frac{(b-c)e \times 100"}{d}$$

> (In this formula "a" is the amount of the adjustment to the current bill, in cents, per kilowatt hour; "b" is the

total cost, in dollars, of the coal burned in Duke's coal fired generating stations during the second month preceding the current billing month; "c" is the base cost of coal, in dollars, which is computed by multiplying by $.004745 the net kilowatt hours generated in Duke's coal fired generating stations during the second month preceding the current billing month; "d" is the total kilowatt hours sold during the second month preceding the current billing month; "e" is an adjustment for revenue-related taxes (1.0638).)

Thus, pursuant to the two orders simultaneously issued 19 December 1973, a bill rendered to a customer of Duke on 19 January 1974 for electric service rendered to him on and after 19 December 1973 was computed as follows:

(1) The basic charge was computed by multiplying the number of kilowatt hours of energy used by the customer, from 19 December through 18 January, by the basic rates fixed by the Commission in its order issued 21 June 1973, increased by the two interim orders of 30 October 1973 and 19 December 1973 (these increases being 8.0 per cent and 2.25 per cent, respectively).

(2) The coal cost adjustment charge was computed in this way: Determine, in dollars, the total cost of coal burned in Duke's coal fired generating stations during November 1973; from this subtract the base cost of such coal (computed by multiplying $.004745 by the net kilowatt hours of energy generated in Duke's coal fired generating stations during November 1973); multiply the remainder so obtained by 100 times 1.0638; and divide the product so obtained by the total kilowatt hours of energy (from all generating sources) sold in November 1973. The number of kilowatt hours used by the customer in the month beginning 19 December 1973 was then multiplied by this coal clause factor so computed.

(3) The customer's January 1974 bill consisted of the sum of (1) plus (2).

Month after month, bills were similarly computed. That is, the coal clause addition to a 19 February bill was computed by using Duke's December 1973 experience rather than that of November 1973, and the coal clause addition to a 19 March

1974 bill was computed by using Duke's January 1974 experience, and so on.

After some months, the matter was set for a hearing by the Commission and, following such hearing, the Commission, on 10 October 1974, issued its order reaffirming its approval of the Coal Cost Adjustment Clause (the order of 19 December 1973) and providing that such clause would remain in effect until 1 November 1974, on which date a "Fossil Fuel Adjustment Clause" would take effect. The Fossil Fuel Adjustment Clause, so approved and put into effect, was exactly like the former Coal Cost Adjustment Clause, except that it related to all types of fossil fuel and the factor used in computing the base cost of fossil fuel was fixed at $.005037 rather than the figure ($.004745) used in the former Coal Cost Adjustment Clause.

Thus, under the Commission's order of 10 October 1974, the fuel increment in the bill of a customer billed 1 November 1974 was not computed on the basis of Duke's coal experience in September 1974, as it would have been under the order of 19 December 1973, but was computed on the basis of Duke's fossil fuel experience in September 1974.

On 9 May 1975, the General Assembly enacted Chapter 243 of the Session Laws of 1975, which added to G.S. 62-134 a new subsection (e) providing:

> "(e) * * * *All monthly fuel adjustment rate increases* based solely upon the increased cost of fuel, as to each public utility, as presently approved by the Commission *shall fully terminate* effective September 1, 1975, except that the same shall be earlier terminated as to each such public utility upon the effective date of any final order of the Commission under this section * * * ." (Emphasis added.)

The application of Duke for approval of the original Coal Cost Adjustment Clause, filed 30 November 1973, stated:

> "[I]t is of the utmost importance to Duke that the Coal Clause be approved and that it be permitted to become effective at the earliest possible date. The protection to Duke's already inadequate rate of return that the Coal Clause would afford is critical in view of alarming indications that the availability and price of coal is [sic] rapidly coming under substantial pressures. * * *

"Considering Duke's weakened financial condition, *the prospects* for dramatic increases in the cost of coal *in the immediate future* present for Duke an alarming situation which must be faced immediately, Duke is simply not in a position financially to absorb the devastating impact that sharp increases in fuel costs *would have* on its earnings.

There are numerous indications that Duke *will be* faced with spiraling coal prices *in the very near future.*

*         *         *

"Duke must be able to attract investor funds in competition with many others. * * * Most of these other utilities * * * already have fuel cost adjustment clauses in their rate structures. * * * Investors and investor advisors are acutely aware of the beneficial effect of fuel cost adjustments * * * on the stability of a utility's earnings * * * . For this reason Duke's common stock and other securities * * * are and will be at a distinct competitive disadvantage in securities markets without the protection of a coal cost adjustment clause." (Emphasis added.)

In the Commission's order of 19 December 1973 allowing the interim increase in Duke's basic rates (i.e., apart from the coal clause increment), the Commission concluded:

"(3) The Commission concludes that the difference in the costs of fossil fuel burned in October, 1973, and burned in July, 1973 in $/KWH should be multiplied by the number of kilowatt hours * * * sold to metered North Carolina retail customers to give the revenues needed to offset the increased costs of fossil fuel. * * * The Commission is of the opinion that *this amount of relief is adequate* and justified *to recover the unusual increase in the cost of coal since the end of the test period.*" (Emphasis added.)

The Commission consolidated for hearing, and ultimately heard together, Duke's application for a $60,000,000 increase in its basic rates (in which proceeding the two interim rate increases above mentioned were ordered) and Duke's application for the addition of the Coal Cost Adjustment Clause. At that hearing witnesses for Duke testified:

*Mr. Frazer:* "The price of coal *is expected to rise* by 36% during 1974 causing an annual increase in expense of

$65 million dollars [sic]. Without the ability to recover those increased costs as quickly as possible, the earnings of the Company would drop to a dangerous level. * * * ." (Emphasis added.)

*Mr. Hatley:* "Since the charge or credit adjustment factor the Clause uses is determined by the cost of the coal burned two months in the past, i.e., the charge or credit applied to January bills is determined by the cost of coal burned in November, it was necessary to use the actual costs of coal burned in October 1973 as the base cost to meet the desired effects. * * *

"Duke desired the effect of a clause to be minimal or inoperative during the initial billing month. *Duke had such a design because we had at the same time asked for an interim increase simultaneously with the coal clause, and it was just our desire that the coal clause be near inoperative at the time it went into effect."* (Emphasis added.)

*Mr. Parker:* "As to the advisability of Duke's having an automatic coal cost adjustment clause in its rate schedules, it is my opinion, and that of Duke's management, that such an adjustment clause is not only advisable, but absolutely necessary, *if we are to procure the coal necessary* to enable us to meet our service responsibility to our customers." (Emphasis added.)

*Mr. Horn:* "*By the end of November 1973, there were numerous indications that Duke would be faced with spiraling coal prices in the very near future.* * * *" (Emphasis added.)

"Duke simply was not in a position financially to absorb the tremendous impact that sharp increases in fuel costs *would have* on its earnings." (Emphasis added.)

The following facts appear from the record before the Commission in the proceeding from which this appeal arises:

Duke filed its application on 29 June 1975, subsequent to the enactment of G.S. 62-134(e), supra, asking two things: (1) that the Commission adjust upward Duke's basic rates, previously fixed separate and apart from the Fossil Fuel Adjustment Clause and, therefore, based upon the cost of coal as it was

prior to the adoption of the Coal Cost Adjustment Clause in 1973; and (2) authority to make an additional surcharge for the recovery of an amount equal to the cost of fossil fuel burned in July and August 1973 less the base cost of such fuel (i.e., b — c in the fuel clause formula for those two months).

The Commission granted the application in both respects. This appeal relates only to the second aspect of its order, the surcharge. The first aspect of the order had the effect of shifting into the basic rates the accumulated increases previously made under the fuel adjustment clauses, thus making these increases permanent, insofar as anything relating to rates for utility service is permanent. Thus a customer billed September 1, for service rendered in August, would, apart from any surcharge, pay at a rate reflecting the full cost of coal burned in serving him.

In its application in the present case, Duke stated:

"Since G.S. 62-134(e) provides for the termination of the fuel clause, it is essential that Duke's basic rate schedules be changed to reflect the current cost of fossil fuel. * * * *The adjustment will permit the recovery by Duke of costs for fossil fuel based upon the current level of costs* and to the extent the level of costs decreases or increases in the future, future applications will seek to have rates adjusted to reflect such changes. * * * [At the hearing evidence was introduced to bring the "current cost" of fuel forward from the date of the application to the time of the hearing.] * * * Upon the entry of an order by the Commission in this docket pursuant to Duke's present Application filed under G.S. 62-134(e), Duke's fuel clause will terminate. At the time of such termination, Duke will have recorded on its books revenues for two months, but such revenues will be unbilled and uncollected. * * * These costs * * * will be accrued but not collected by Duke unless recoverable under an order of the Commission." (Emphasis added.)

At the hearing Mr. William Stimart, Treasurer of Duke, testified:

"*This application seeks to incorporate into the Company's basic rates the level of fossil fuel cost the Company has been recovering through the fossil fuel clause* * * *

which terminates under the provisions of the new statute. * * *

"At the point in time that G.S. 62-134(e) terminates the present fossil fuel clause, there will be recorded on the Company's books two months of unrecovered fuel costs; which unless specifically provided for by the Commission in response to this application would forever be lost to the Company. * * *

"As to whether we would be collecting, let us say in August, for actual costs of fuel in June, under either the new or the present, I think the rule is changed, I think under the present fuel cost it is fair to say that the Commission's order that we have had in the interpretation that you are right, that we would collect in August, I think *under the new rules and regulations, that we would collect in August and [sic] estimate for August costs, not June costs.* * * *

"See, we have wiped out under the new procedure the mechanics of an automatic lag and automatically collecting 'X' months forward that cost which we incurred previously. And to use August is a bad month, we ought to speak to September. *In September we will collect whatever the Commission says is aceptable level of fuel.* They don't identify that as June's cost or they may use June mathematically to determine what they think September is going to be. But, we will collect in September, we will not be subject to refund, if we undercollect, in relationship to the actual, that is tough. If it turns out that we have undercollected for that month of September, I understand that we can make an application that says, look, we undercollected in September, we want to make sure come the next month we are able to collect, we are able to collect from the customers what we now know is the proper level of fuel costs. And similarly if we found we overcollected, I believe under the rule we are under some compulsion to file an application to do something about that.

"As to whether under the operation of the rule we would reduce the customers' future fuel cost expense because the September costs were actually less than that charged, I don't like to identify with the month of September, you are right in saying, look the fuel cost has gone

down, so now, we now have a new experience factor so that lowers the level of fuel cost that you are collecting from the customer, so when we have the September experience and we find that out in November *we are not going to tell the customers we are adjusting the November bill because of what we billed them in September, but because we now know or have experienced a new level of fuel cost, which is lower than what we had been collecting from them, it is just like almost a rate case in itself. We file a new rate case, we start collecting rates now. We don't go back and we don't get to go back and collect from the customer in 1974 when we found out we did not collect enough from him.*" (Emphasis added.)

*Rufus L. Edmisten, Attorney General, by Robert P. Gruber, Special Deputy Attorney General.*

*Edward B. Hipp, Commission Attorney, by Wilson B. Partin, Jr., Assistant Commission Attorney, for North Carolina Utilities Commission.*

*Steve C. Griffith, Jr., General Counsel; George W. Ferguson, Jr., Deputy General Counsel; Kennedy, Covington, Lobdell & Hickman by John M. Murchison, Jr., for Duke Power Company.*

LAKE, Justice.

This case is a companion to No. 143, *State ex rel. Utilities Commission and Virginia Electric & Power Company v. Edmisten, Attorney General,* and No. 144, *State ex rel. Utilities Commission and Carolina Power & Light Co. v. Edmisten, Attorney General.* The three cases were argued together and, as the Court of Appeals observed in affirming the orders of the Utilities Commission, while in the three cases there are variations in dates, and the amounts involved and other inconsequential matters, the legal questions are the same. The briefs of the parties in the several cases so show. They have been considered together and all arguments made and authorities cited in the several briefs have been taken into consideration in this decision.

In Case No. 39, *State ex rel. Utilities Commission and Carolina Power & Light Co. v. Edmisten, Attorney General,* 291 N.C. 327, 230 S.E. 2d 651, decided 21 December 1976, this Court sustained the validity of the fuel adjustment clauses which the

Commission authorized Duke, CP&L and Vepco to put into effect in late 1973 and early 1974. The present cases are an aftermath of those clauses which were terminated, as of 1 September 1975, by the enactment of G.S. 62-134(e) in the spring of 1975.

G.S. 62-134(e) provides: "*All* monthly fuel adjustment rate increases based solely upon the increased cost of fuel, as to each public utility, as presently approved by the Commission shall *fully terminate* effective September 1, 1975 * * * ." (Emphasis added.)

G.S. 62-134(e) also provides that, upon application by a public utility, the Commission, solely on the basis of the increased cost of fuel used in the generation of electric power, may authorize such utility to increase its rates.

Pursuant to this statute, the three electric utility · companies applied to the Commission for authority to increase their basic rates for electric power and, in addition, to put into effect a temporary surcharge. The Commission, in the case of each company, did two things: (1) It authorized the utility to increase its basic rates, chargeable for electric power billed on and after 1 September 1975 (i.e., generated and sold on and after 1 August 1975), to reflect (i.e., to pass on to the users of power) the full cost of fossil fuel used in generating such power, such cost being computed on the basis of the then most recent available data; (2) it ordered the utility to put into effect a further charge to its customers, to be spread over a period of 10 months, sufficient in the aggregate to yield to the company the full expense (over and above the previously established base price of fuel) incurred by it for fossil fuel burned in July and August 1975 in the generation of electric power. Only this surcharge is involved in the present appeal.

Had there been no surcharge whatever, the increase in the utility's basic rates so allowed by the Commission would have produced for the utility in September 1975 (that is, from October bills for September service) the same, or substantially the same, revenue which that company would have derived under the old Fossil Fuel Adjustment Clause had it not been terminated by the Legislature. This is shown by the testimony of Mr. Behrends, Vice President of Carolina Power & Light Company, and the testimony of Mr. Stimart, Treasurer of Duke Power Company, who testified as witnesses for their respective

companies before the Commission in the hearings in the present cases.

Mr. Behrends testified:

"Now, insofar as the customer is concerned * * * there will be no practical difference to him as of September 1, whether or not there is a fuel adjustment clause. He will have a charge that includes the fuel cost, he will certainly have a bill that includes the fuel costs as precisely as administration and nature of this proceeding will permit it to be. * * * At the present time we have filed to do what the statute requires, to obtain a base rate which best reflects our current level of fossil fuel expense."

Mr. Stimart testified:

"This application seeks to incorporate into the company's basic rates the level of fossil fuel cost the company has been recovering through the fossil fuel clause * * * which terminates under the provisions of the new statute. * * * In September we will collect whatever the Commission says is acceptable level of fuel."

Thus, the surcharge here in question enables the utility, in addition to collecting from its customers in September 1975, and subsequent months, the entire amount which it would have collected had the fuel clause remained in force, to collect also an aggregate for the three companies of approximately $36,-000,000 on account of coal burned in July and August 1975.

Some time after the original Fuel Adjustment Clause was put into effect, each company put into effect accounting practices with reference to its expenses for fuel and revenues collectible under that clause. These varied from company to company. Apparently, Duke's procedure was to enter upon its books, in the month in which the fuel was burned, what it designated thereon as "unbilled revenues," these being the amounts it estimated would be received by it pursuant to the Fuel Adjustment Clause. CP&L's practice appears to have been to deter the entry of coal expense to the month in which it billed its customers for the electricity generated by the fuel so burned. These accounting practices were subsequently approved by the Commission. Thus, they were proper accounting practices for purposes such as determining net income for tax purposes and making reports of net income to stockholders and investment

services. Although these were proper accounting practices, they could not create a liability upon the company's customers or establish the company's right to recover from its customers the amounts so entered. Duke concedes this in its brief, stating: "Duke in no way asserts that its entitlement to recover its un-billed revenues involved in this appeal arises because of the accounting practices approved by the Commission."

The companies say in their briefs that, by reason of the termination of the Fuel Adjustment Clause rate increases by G.S. 62-134(e), they could not "recover" such "unbilled reve-nues" or "deferred expenses" shown on their books as of Sep-tember 1, 1975, unless the Commission took action authorizing them to do so. That is, the companies concede that G.S. 62-134(e), standing alone, would deprive the companies of any right to collect from users of power that which the surcharge here in question permits them to charge and collect. The com-panies do not challenge the constitutionality of this termination by the Legislature of the Fuel Adjustment Clause. This they could not have done successfully without a showing that the rates left in effect by the Legislature deprived them of a fair return upon their properties used and useful in rendering serv-ice to the public. No such showing was made or undertaken by the companies in these cases. They rely entirely upon the order of the Commission allowing the surcharge.

[1, 2]   The Commission is a creation of the Legislature and, in fixing rates to be charged by public utilities, exercises the legis-lative function. It has no authority except that given to it by statute. *Utilities Commission v. Merchandising Co.*, 288 N.C. 715, 722, 220 S.E. 2d 304 (1975) ; *Electric Service v. City of Rocky Mount*, 285 N.C. 135, 203 S.E. 2d 838 (1974) ; *Utilities Com-mission v. Telephone Co.*, 281 N.C. 318, 189 S.E. 2d 705 (1972) ; *Utilities Commission v. R. R.*, 268 N.C. 242, 245, 150 S.E. 2d 386 (1966) ; *Utilities Commission v. Motor Lines*, 240 N.C. 166, 81 S.E. 2d 404 (1954). *A fortiori*, the Commission has no au-thority to permit that which is forbidden by statute or to extend a previously granted rate increase which the statute has de-clared terminated. In its brief in this Court the Utilities Com-mission states:

"The termination of the old fuel clause on September 1, 1975, pursuant to G.S. 62-134(e), prevented the recovery of Duke's July and August fuel expenses through the nor-

mal operation of the fuel clause. The Commission's Order of August 27, 1975, permitted Duke to recover through the surcharge these two months costs actually incurred. In so deciding the Commission was squarely faced with the interpretation of G.S. 62-134(e). Clearly the statute terminated the old fuel clause effective September 1, 1975. The question remained as to whether Duke could recover the fuel expenses which were incurred in July and August, 1975 and which were recoverable under the old fuel clause. *The Commisison decided* that the Legislature did not intend to penalize Duke by denying it recovery of its July and August, 1975, fuel expenses actually incurred." (Emphasis added.)

[3]  When the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction. *Peele v. Finch,* 284 N.C. 375, 200 S.E. 2d 635 (1973) ; *Utilities Commission v. Membership Corp.,* 275 N.C. 250, 166 S.E. 2d 663 (1969) ; *Colonial Pipeline v. Clayton,* 275 N.C. 215, 166 S.E. 2d 671 (1969) ; *Valentine v. Gill,* 223 N.C. 396, 27 S.E. 2d 3 (1943) ; *In re Poindexter's Estate,* 221 N.C. 246, 20 S.E. 2d 49, 140 A.L.R. 1138 (1942) ; *Morris v. Chevrolet Co.,* 217 N.C. 428, 8 S.E. 2d 484, 128 A.L.R. 132 (1940) ; *Williamson v. High Point,* 213 N.C. 96, 195 S.E. 90 (1938). It is difficult to imagine language clearer than this provision of G.S. 62-134(e) : "*All* monthly fuel adjustment increases based solely upon the increased cost of fuel, as to each public utility, as presently approved by the Commission shall *fully terminate* effective September 1, 1975." (Emphasis added. )

[4]  The contention of the companies and the Commission that other provisions of Chapter 62 of the General Statutes, including G.S. 62-3(24) authorizing the Commission to fix reasonable and just rates for public utility service, permit the Commission to extend its previously authorized rate increases "based solely upon the increased cost of fuel" beyond 1 September 1975 is utterly without merit. It is well established that when there are two statutes, one dealing specifically with the matter in issue and the other being in general terms which, nothing else appearing, would include the matter in question, the specific statute controls. *State v. Baldwin,* 205 N.C. 174, 170 S.E. 645 (1933) ; *Young v. Davis,* 182 N.C. 200, 108 S.E. 630 (1921) ; *Bramham v. Durham,* 171 N.C. 196, 88 S.E. 347 (1916). G.S. 62-134(e)

deals specifically with the continuation of previously granted rate increases based solely on the increased cost of fuel. The Commission's "decision" that the Legislature, in enacting this statute, did not intend to deny the utility "recovery of its July and August 1975 fuel expenses actually incurred" is not an interpretation of the statute but a nullification of it, which is beyond the authority of the Commission. The wisdom and fairness of the Legislature's determination, clearly expressed, may not be reviewed by the Commission, or even by the courts in the absence of a constitutional question, which is not presented on this appeal.

[5]   There is, however, no basis for declaring the legislative termination of the fuel clause rate increases unjust or, in the language of the Commission's brief, a "penalty." G.S. 62-134 (e) did not roll back electric power rates. On the contrary, it authorized the Commission, after hearing, to incorporate into the basic rates of the utility, chargeable on and after 1 September 1975, an increase determined by the then cost of coal. As above noted, the testimony of officials of the companies shows that is precisely what the Commission did, separate and apart from the surcharge here in question. The "decision" of the Commission to permit the companies, in addition, to collect, by surcharge, the amount they would have collected under the Fuel Adjustment Clause in September 1975, simply flies in the face of the statute.

[6]   The theory of the companies, and of the Commission, upon this appeal is that in the months of July and August the companies incurred an actual expense for fuel burned in the generation of electric power, as shown on their respective books, and this amount they had a right to collect in September and thereafter, notwithstanding the termination of the fuel clause rate increases, for the reason that this accumulation resulted from a lag between the incurring of the expense and the collection from the customers of bills for service. That is, the companies contend, and the Commission acquiesces, that the purpose of the Fuel Adjustment Clause was to enable the company to recover expenses incurred by it prior to the month in which service was rendered and, therefore, prior to the month in which the customer was billed for such service. The contention of the Attorney General is that the Fuel Adjustment Clause had no such purpose but was a device to charge the customers for the expense of coal burned in serving them during the month for

which the bill is rendered. That is, the Attorney General contends that the Fuel Adjustment Clause uses the company's experienced fuel costs, in the month preceding that in which the electricity is consumed, only as a measure of the cost of fuel used in generating the power for which the bill is rendered.

To resolve this question, we must go back to December 1973 when the Fuel Adjustment Clause was first authorized. For the reasons hereinafter set forth, we conclude that, as of 1 September 1975, there was no accumulation of money due the companies under the Fuel Adjustment Clause in addition to that collectible through the companies' regular bills for service in prior months.

Duke (and the other companies similarly) speaks of a 60 day lag, inherent in the Fuel Adjustment Clause, in Duke's recovery of its fuel expense. There was no such regulatory lag. Duke applied to the Commission on 30 November 1973 for two things: (1) An interim increase in its basic rates because of the rise in the price of coal experienced by Duke after 31 July 1973, the end of the orthodox 12 months test period used in Duke's then pending general rate case; (2) a clause permitting further monthly increases in rates if and when further increases in the cost of coal occurred. The Commission granted both petitions, the Fuel Adjustment Clause authorized by it being the identical clause for which the company petitioned.

On 19 December 1973, less than three weeks after the petition was filed by Duke, the Commission put the Fuel Adjustment Clause into effect. The clause became effective upon every kilowatt hour sold on the day the order was issued and thereafter. To be sure, the money was not collected from the customer until the customer was billed one month later, pursuant to Duke's normal billing practice. That is, the first fuel adjustment clause rate increase took effect 19 days after Duke applied for it and the revenues resulting therefrom were received by the company in its due course of billing for service rendered. From time immemorial, electric power companies in this State have billed their customers for electric service at the end of the use month, instead of collecting in advance by the use of coin operated meters or some other billing device. Thus, this so-called lag is the result of the company's own sound business practice and is not something inherent in the Fuel Adjustment Clause.

Each month, during the life of the Fuel Adjustment Clause, the rate increase authorized thereby was applied to every kilowatt hour sold in that month and was billed and collected in the usual way at the end of the use month. Thus, there could be no collectible accumulation of fuel expense at the end of the life of the Fuel Adjustment Clause unless there was, at its inception, a right to collect for then past fuel expense. We think it clear that it was not the intent of the fuel clause applied for by Duke on 30 November 1973 to charge December users of power so as to permit the recovery by Duke of coal expense incurred in November, but the intent was to use the November experience, the most recently available data, as a measure of the December fuel expense recoverable from December users of power. Had the Legislature, immediately after the Commission put the Fuel Adjustment Clause into effect, enacted G.S. 62-134(e) so as to terminate the Fuel Adjustment Clause on 1 January 1974, we think it inconceivable that serious consideration would have been given to a contention that the utility was entitled to a surcharge on 1974 users to recover fuel expense incurred by Duke in November 1973, the month before the Fuel Adjustment Clause was even applied for by Duke.

The Attorney General argues that such a surcharge would be retroactive rate making, which, as all of the parties agree, would be improper. *Utilities Commission v. City of Durham,* 282 N.C. 308, 318, 193 S.E. 2d 95 (1972) ; *Utilities Commission v. Morgan,* 277 N.C. 255, 267, 177 S.E. 2d 405 (1970). We agree with the argument of the companies, and of the Commission, that this contention of the Attorney General is not technically correct. Technically, retroactive rate making occurs when an additional charge is made for past use of utility service, or the utility is required to refund revenues collected, pursuant to then lawfully established rates, for such past use. The surcharge here in question (and the hypothetical surcharge in 1974 above mentioned) is a charge to customers for power used after the surcharge took effect and, therefore, is not, technically, retroactive rate making. This, however, does not deprive the Attorney General's attack upon the surcharge of validity.

The basic theory of utility rate making, pursuant to G.S. 62-133, is that rates should be fixed at a level which will recover the cost of the service to which the rate is applied, plus a fair return to the utility. A utility company may not properly be denied the right to charge such a rate, for the present use

---

---

of its service, for the reason that, in a preceding month, the utility earned an excessive rate of return due to the fact that an expense which it was expected to incur in such previous month did not materialize. For example, rates for use of a utility's service are set at a level which will enable the company to pay, among other items, its anticipated tax expense. If, by virtue of some change in the tax law, it develops that the company did not incur the anticipated expense, for the payment of which it collected revenues in prior months, its rates for present and future service may not be cut, on that account, below what it otherwise would be entitled to charge for the present or future service. Likewise, a failure of the utility, in a previous period, to earn the anticipated return over and above its then expenses does not authorize it to charge its present customers a rate higher than reasonable for present service in order to compensate for the past deficit. Prospective rate making to recover unexpected past expense, or to refund expected past expense which did not materialize, is as improper as is retroactive rate making. *Los Angeles Gas & Electric Corp. v. Railroad Commission of California,* 289 U.S. 287, 313, 53 S.Ct. 637, 77 L.Ed. 1180 (1933); *Bd. of Public Utility Comrs. v. New York Telephone Co.,* 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808 (1926); *Bluefield Waterworks & Improvement Co. v. Public Service Commission of W. Va.,* 262 U.S. 679, 694, 43 S.Ct. 675, 67 L.Ed. 1176 (1923); *Mississippi Public Service Commission v. Home Telephone Co.,* 236 Miss. 444, 110 So. 2d 618 (1959); *New Jersey Power & Light Co. v. State Dept. of Public Utilities,* 15 N.J. 82, 104 A 2d 1 (1954); *Wisconsin Telephone Co. v. Public Service Commission,* 232 Wis. 274, 287 N.W. 122 (1939), cert. den., 309 U.S. 657, 60 S.Ct. 514, 84 L.Ed. 1006. In a carefully reasoned and well documented opinion by Chief Justice Vanderbilt in *New Jersey Power & Light Co. v. State Dept. of Public Utilities, supra,* the New Jersey Court overruled its earlier decision in *Hackensack Water Co. v. Board of Public Utility Commissioners,* 98 N.J.L. 41, 119 A. 84, 100 N.J.L. 177, 124 A. 925 (1924). In that earlier decision, the Court had held a public utility is entitled to recoup deficits in operations by a temporary surcharge added to its regular rates. In reversing this ruling the Court, speaking through Chief Justice Vanderbilt, said: "To do this would be adding a further charge to rates that are already just and reasonable, *which is beyond the Board's powers.*" (Emphasis added.) In *Mississippi Public Service Commission v. Home Telephone Co.,*

*supra,* the Court said, "It is generally held that neither losses sustained nor profits gained by a public utility in the past may be taken into account in fixing rates to be charged in the future," citing 73 C.J.S., Public Utilities, § 25 (d). In *Wisconsin Telephone Co. v. Public Service Commission, supra,* the Court said, "As already pointed out, the cases hold that in establishing a rate for the future, and in the absence of statutory authority therefor, the Commission may not amortize or make a rate sufficiently low to recapture the excesses."

Such rate making throws the burden of such past expense upon different customers who use the service for different purposes than did the customers for whose service the expense was incurred. For example, the surcharge here in question requires Duke's customers in the winter months to pay more than they otherwise should pay for their service because of the cost of coal burned in July and August in supplying electricity for air conditioning.

The companies and the Commission contend that there is nothing improper in amortizing expenses actually incurred in a past period so as to spread them over a future period of service. They refer, in support of this argument, to the practice of so amortizing the expenses of a rate case and to depreciation allowances. These are easily distinguishable from expense incurred for coal burned in a past period. Of course, the full amount of an expenditure for an addition to plant, which will be used in rendering service over a long period of time, is not, and should not be, charged to the customers who use the service in the month of such expenditure, but is spread over the anticipated life of the equipment. This is but a recognition of the above mentioned principle that the users in each period should be charged with the cost of service attributable to that period. So it is with the expense of a general rate case. That expense relates to service rendered throughout the anicipated life of the rates established in that proceeding and should be, and is, amortized so that the entire expense does not fall upon the users of the service in the month in which the expense is actually incurred.

The cost of coal burned in generating power has, however, no relation whatever to service in any subsequent month. Thus, it, like wage expense, should be borne by the users of the service in the month in which the expense was incurred and may not

properly be amortized so as to make subsequent users pay part of this burden. So to cast upon subsequent users the expense of serving prior users is discrimination forbidden by G.S. 62-140. Thus, even if, as of 30 November 1973, when it applied for permission to use a fuel adjustment clause, Duke could have shown that in November 1973 its rates were not sufficient to recover the full cost of coal burned in generating electricity in November 1973, Duke would have established no vested right to collect its unanticipated November 1973 fuel cost either from its November customers, which would be retroactive rate making, or from its subsequent customers for whose service the coal was not burned. There is no inherent injustice in this for had Duke, in November 1973, been relieved from some anticipated expense, such as taxes, its November 1973 customers would not have been entitled to a refund and its December 1973 customers would not have been entitled to have their rates reduced below the amount necessary to enable Duke to recover its December costs plus a fair return.

It must be remembered that on December 19, 1973, the Commission did two things: (1) It increased Duke's basic rates because Duke's coal expense since 31 July 1973 had risen unexpectedly; (2) it authorized a fuel adjustment clause. The Commission found that the increase in the basic rates was adequate to cover the increase in Duke's coal cost since 31 July 1973. That increase in the basic rates was, however, prospective in operation. It has never been suggested that thereby the Commission intended to, or could have, given Duke the right to go back and charge its August, September, October and November customers additional amounts to recoup its unexpected cost of coal incurred in those months, nor has it been suggested that the Commission, in addition to the prospective increase in the basic rates, could have also imposed a surcharge in December 1973 requiring December and subsequent users of power, after paying Duke the cost of serving them plus a fair return, to pay still more in order to enable Duke to "recover" its unanticipated coal expenses incurred from 31 July 1973 to November 1973.

That action, on 19 December 1973, increasing the basic rates because of past experience with coal costs, was simply the orthodox use of a test period; that is, a use of the company's experience in the past (the test period, extended) as a guide to, or measure of, what its expenses would be in the future.

See: *Utilities Commission v. Morgan,* 278 N.C. 235, 236, 179 S.E. 2d 419 (1971).

The purpose of the simultaneously authorized Fuel Adjustment Clause was not to recover the November portion of that past unexpected expense but to guard against the then feared future changes in the price of coal. This clause was designed to give the utility relief from possible future rapid fluctuations in the price of coal without the regulatory lag and the expense incident to repeated general rate cases.

This is made clear by Duke's application for permission to establish the fuel clause and by the testimony of its witnesses in support of that application, as above quoted in the Statement of Facts. These clearly show that Duke's November 1973 concern was not with recovery of unanticipated November 1973 coal expense but with the then ominous prospect of further increases in the price of coal, which did in fact materialize.

The Fuel Adjustment Clause was, like the basic rate increase procedure, simply the orthodox use of a test period. Instead of the usual twelve months test period, used in general rate cases with reference to all expense experience of the utility, the Fuel Adjustment Clause used a one month test period with reference to coal expense alone. When approved on 19 December 1973, it applied instantly to all kilowatt hours sold that day. It used the most recently available coal cost data (November experience) to determine the cost of coal per kilowatt hour to be anticipated in December. Like other test period data, this data was used as the most accurate measure of the cost of coal per kwh on 19 December 1973 and throughout that month. Similarly, for kwh sold in January 1974, the coal cost per kwh in December was used, and the change per kwh, if any, was instantly made effective as to every kwh sold in January. It was likewise as to each subsequent month to and including July and August 1975.

There was no deferred accounting of coal expense used by the companies in November 1973. This was an accounting technique developed by the companies and approved by the Commission after the Fuel Adjustment Clause took effect. Its propriety for use in computing the company's tax liability and net income for reporting to its stockholders and investment analysts is not involved in this appeal and nothing herein should be deemed as a suggestion of impropriety in the practice. It does

not, however, support the contention that the Fuel Adjustment Clause was designed to enable Duke to "recover" from December users of power its unexpected cost of coal in November 1973.

Quite obviously, the Fuel Adjustment Clause adopted in December 1973 was not designed to "recover" Duke's November expenditures for coal. The coal factor to be applied in December was computed on the basis of November experience because that was the then best guide to December cost, but it was applied to the kilowatt hours sold in December. Thus, it would, of necessity, produce a different dollar amount from the amount paid out for coal burned in November. Since the kilowatt hour sales of all these electric utilities has steadily expanded, each month's use of the coal clause has actually produced more dollars than was spent for coal in the test month (in Duke's case, the month preceding the month in which the current was used).

For example, let us suppose that, in November 1973, two hundred million kilowatt hours were sold and the excess coal cost was $200,000. On that assumption, the coal clause factor for December would be one mill (disregarding the tax). Let us further suppose that, in December 1973, 250 million kilowatt hours were sold. The fuel clause revenues collected from December service would then be $250,000, or $50,000 more than the November excess coal cost. Let us, on the other hand, suppose that in December 1973 only 150 million kwh were sold. In that event, the coal clause revenue would be $150,000, or $50,000 less than the excess coal cost in November 1973.

The Vepco case makes this even clearer, for Vepco's fuel adjustment clause did not use a single month's experience in computing the fuel clause factor to be applied to kilowatt hours sold thereafter but used a three months' average coal cost per kilowatt hour. Thus, the Vepco case makes it clear that the purpose of the Fuel Adjustment Clause was not "recovery" of past excess expenditures for fuel but was to provide a measure of the reasonably anticipated cost of coal used in generating the kwh to which the factor was to be applied.

On 10 October 1974, the Commission issued a further order which converted the original Coal Adjustment Clause to a Fossil Fuel Adjustment Clause. That order switched from the one clause to the other as of 1 November 1974. There was no sug-

gestion then that a surcharge be made to "recover" the amount then accumulated on the company's books under the original coal clause over and above the rates subsequently to be charged under the Fossil Fuel Clause. Thus, when the Commission terminated the Coal Clause and instituted the Fossil Fuel Clause, neither it nor the companies suggested the propriety of an additional surcharge to recover "unbilled revenues" (or "deferred expenses") accumulated during the life of the original Coal Clause. Likewise, when the Legislature terminated the Fossil Fuel Clause and rates were adjusted so as to enable the company to collect for services billed after 1 September 1975, the full cost of such service plus a fair return, justice does not require an additional surcharge because of expenditures for coal burned in July and August.

For the reasons above set forth, the Commission's order, permitting Duke to impose the surcharge here in question, was in excess of the Commission's authority and without justification either in law or in the name of fair play. The judgment of the Court of Appeals is, therefore, reversed and this matter is remanded to the Court of Appeals for the entry of a judgment by it remanding the matter to the Commission for the entry of an order by the Commission vacating its order authorizing the surcharge and directing Duke to make the appropriate refunds to its customers on account of revenues unlawfully collected from them pursuant to the surcharge.

Reversed and remanded.

Justice COPELAND dissenting.

In my judgment the majority opinion does not conform to the General Assembly's intent in passing G.S. 62-134(e). Neither do I believe that the majority opinion places a proper interpretation upon the rulings of the Utilities Commission in the instant case.

It is well known that the problem here involved stems from the 1973 world-wide energy crisis brought about by tremendous increases in the cost of fossil fuels, most particularly coal, which is used by the utilities for the generation of electricity. On 30 November 1973, Duke Power Company filed with the Commission an application for authority to adjust its retail electric rates by the addition of a coal adjustment clause to be

rendered on monthly bills on and after 1 January 1974. On 19 December 1973, the Commission authorized the requested coal adjustment clause. The Commission's order provided that the clause would not become effective unless and until coal costs increased above the October 1973 level and included the following language:

"1. That effective on bills rendered on and after January 19, 1974 for service rendered on and after December 19, 1973 *with respect to coal burned on and after November 1, 1973,* the Applicant, Duke Power Company, is authorized and permitted to put into effect the coal cost adjustment clause attached to its application as Exhibit B.

"2. That Duke Power Company will report to the Commission on a monthly basis the amount of the fuel cost adjustment and the factors and computations used in its derivation." (Emphasis supplied.)

By this order I believe the Commission authorized a two-months "lag" in the recovery of increased actual coal costs. A lag was necessary because the actual cost of fuel burned during the month electric service was provided was unknown at the time of the billing. Had the General Assembly not passed G.S. 62-134(e) in 1975, then the "lag" would continue in effect and the utility companies would still be basing their current billing on the fossil fuel excess costs two months previous.

While it is true that Duke does not claim to be entitled to recover its unbilled revenues because its accounting practices were approved by the Commission, the company does claim and contend "that the entries resulting from such accounting practices serve as the device for measuring the amount of fuel costs Duke had a vested assurance of collecting pursuant to its approved rates." Duke Power Company's "right" to recover its unbilled revenues arises from the Commission's approval of the automatic fuel adjustment clause permitting recovery on a deferred basis of these expenses.

Obviously, the Commission recognized the principle of unbilled revenues upon which the utility companies base their claim. In its first order under the new statute, G.S. 62-134(e) the Commission stated as follows: "[A]ccrual accounting for unbilled revenues to reflect the *lag* in recovery of increased fuel costs should be disallowed in the future." (Emphasis supplied.)

It is equally clear that the Commission recognized the unbilled revenue or "lag principle" in its initial order when it provided that the order would apply "with respect to coal burned on and after November 1, 1973 . . . "

Considering the automatic fuel clause adjustment and the temporary surcharge together, it is apparent that the Commission has done nothing more than allow Duke Power Company to collect its actual fuel expenses. The Commission has merely attempted to carry out the mandate of the legislature which requires that the utility earn a fair return. The power companies have operated on the basis that these unbilled revenues were assets that would be collected in two months. The customers have not paid any more than the actual fuel cost and no benefit beyond a reasonable rate of return has accrued to shareholders.

I see nothing wrong with the order providing that the two months of unbilled revenues be spread over a period of twelve months to ease the burden on the rate payers. The amortization is a matter of convenience for the consumer.

By the passage of G.S. 62-134(e), the General Assembly did not intend to penalize the utility companies. The Commission was justified in reaching this conclusion. The majority's treatment of the utilities appears inequitable and does not take into consideration the position the companies were placed in over three years ago. During this period in which the costs of fossil fuel were rapidly rising, the time lag was favorable to the consuming public. In order for the utilities to produce the services which the consuming public requires, we must be equally fair with the utilities in providing revenues to meet emergencies such as the one which precipitated this controversy.

The majority opinion provides for "appropriate refund [by Duke Power Company] to its customers on account of revenues unlawfully collected from them pursuant to the surcharge." This will be an expensive and administratively difficult operation for the utilities involved. The financial benefits to individual members of the consuming public will be quite small in comparison with the burden cast upon the utility companies.

In sum, I feel the Utilities Commission manifested its intent from the beginning that the utilities should eventually

recover all actual fuel cost increases including the two months of excess fuel costs that are involved in this suit. I do not believe the General Assembly ever intended to deprive the companies of these revenues. I agree with Judge Britt of the Court of Appeals that the orders of 19 December 1973 and 10 October 1974 might have been clearer, but a reasonable construction of the orders leads me to conclude that "they were sufficient to accomplish that purpose."

Chief Justice SHARP and Justice MOORE join in this dissent.